The next appeal is Henry McNeil, Appeal 1546 from 2008. Good morning, and may it please the court, I'm Diane Ellerkin, arguer in support of McNeil. This court has jurisdiction over McNeil's appeal. The appeal was timely filed. Within two months, the board is in action on McNeil's request for a re-hearing. And the court should exercise its discretion for its jurisdiction by reversing the Patent Office's rejection of Claims 1, 3, and 4 of the 269 package because the Patent Office's findings are not supported by substantial evidence. It seems to me you've got a problem in the sense that the statute will refer to date of decision, whereas the federal rules refer to entry of judgment. And date of decision, it strikes me, must mean something different than entry of judgment. So, why isn't that a problem? Well, the Patent Office had the ability to promulgate rules to effectuate the statute, and Rule 304 talks about the date of decision, two months from the date of decision of the Board of Appeals decision, or two months from the action on a request for re-hearing. Does action mean date of decision? Well, that's an issue. That's the solicitor's position. The issue here is what does action on the request mean? But the date of decision is May 30th, right there. Well, that is the solicitor's position, but the long-standing practice- It says decided May 30th. Right. Well, the caption that is referred to there on the front page of the decision has not- there's been no long-standing practice of the use of that type of caption. As we point out in our brief- What difference does that make? I mean, who cares what the PTO practices? This is a question of our jurisdiction. We don't defer to them on an interpretation of a statute which confers jurisdiction on us. There's no Chevron deference there. So, it seems to me we don't care what they think about it, other than we listen to them as their argument is made as to what the meaning of the statute and the rule is. Well, it's a matter of what is a fair construction of the language of Rule 304. The solicitor agrees that no deference here is attaching to the solicitor's position, to the director's position, because there is no long-standing practice with respect to whether the date of decision caption that you find on the decision here, and which was only started to be put on to decisions in a hit-or-miss manner. Well, what if they've been doing it for 20 years? What difference would that make? It seems like it's either right or wrong. Their definition is either correct or it's not correct, and it wouldn't matter whether they've done it for one day, one year, or a decade. Well, it's an issue of fairness to the public. It's an issue of fairness if the long-standing practice is, and this is not disputed, the long-standing practice is that the two-month period in Rule 304 runs from when a decision is entered. When you say long-standing practice, you mean that's the understanding of patent prosecuting? Yes, and that's the evidence in the record. The solicitor has not disputed that. That's Mr. Nace. That's Mr. Nace, and that has not been disputed by the solicitor. So what? I mean, who cares? I mean, it's up to Congress to adopt a rule, to adopt a standard of date of decision that may be fair. It may be unfair. That's what they tell us is the rule to apply. We don't have discretion to dispute, to rewrite the rule, right? But the date of decision has always been interpreted to be the day the decision was entered. And as we show here, the date of decision is a caption that started to be put onto some board decisions in hit-or-miss manner in mid to late 2006. For all the years prior to that, date of decision in Rule 304 had been when the decision was entered. But what do you say has always been interpreted? Not by this court, right? Not that I know of. And not by the Patent Office. I'm not aware of any rulings on the Patent Office. There's nothing you can point to that we've ever said or they've ever said that date of decision equals when it's made. So you're just saying that was what you understand to be the view, the interpretation of practitioners. That has been the practice, yes. Let me ask you a hypothetical because it seems to me that longstanding practice is not very helpful here one way or the other. But maybe I'm wrong. But let me bring out another dimension. Suppose I issue a decision today for a patent. And on the decision, I put the date three months and one day ago, January 1st. But it's issued to the parties and the public today. What's the date of decision? Well, my understanding is under the practice of this court, the date of decision is when the decision is issued. Actually made available to the public, to the parties. So in other words, somebody wouldn't be late with a cert petition even though it's more than 90 days when they get the decision from the date that is listed as the decided date, which I've stipulated would be January 1st. That's right, Martin. And we've explained that there's that possibility in our brief. The solicitor's characterized it as the greatest evidence that could ever happen. And that points to just the problem we have here with relying on the caption. Again, apply hit or miss. In our case, the caption, the decision. Let me ask you another hypothetical. Suppose that I put out a decision and today's date on it, and I get two colleagues to concur in the decision. And then the decision is dated today. And then before it's issued publicly and to the parties, I change my mind. And I go back and rewrite the decision, and it takes me a month, and then I send it back to the two colleagues. Here's my new opinion in the blah blah case. What significance does today's date have in that context? Well, it should be the date the final decision is issued by the panel and made available. Otherwise, you run the risk of having an interim decision that is subsequently changed according to date. And that is obviously not what should have been contemplated. On this record, you had two dates to choose. You had the date it was entered, and you had the date on the face of the opinion. Why didn't you just play it safe and make sure you complied with both? In a perfect world, if we would have done that, we wouldn't be here. But again, longstanding practice. It's not disputed that the IFW is the official final record. It's not disputed that this was entered into the official final record on June 2nd and that we filed our notice of appeal within two months of that date. But your problem is that Congress, when it drafted this statute, it knew about the entry of judgment. It knew how to talk about entry. It talked about entry when talking about appeals from the district courts to the courts of appeals. The Supreme Court talked about entry for the 90 days for the search order. They don't use date of decision. Congress used a different standard here. It used date of decision. It chose not to use entry. Why isn't that fabled? Again, because the issue here is how the Patent Office has correctly construed the term action on the request. Because here we're dealing not with a board hearing, a board decision, but a request for a hearing. Rule 304 talks about action on request. The two-month period runs from the action on request. And the judge then talks about the federal rules, but there are other analogs. For example, in the case of, if I recall correctly, of Merit System Protection Board decisions, the appeal regulations specify that the date of mailing starts the clock running for filing an appeal. So obviously, if the date of mailing is intended to be what shoots off the starting gun for a limited time period, Congress and regulators know how to verbalize that. They say, date of mail. That's what they intend. So that makes it sound like date of decision is supposed to be something else. I think one of the issues that we were mentioning here is that this has all come about at the same time as the Patent Office has switched over to electronic records. For years and years and years, there was paper records. We had a decision that was issued. It was generally mailed the same day. We're not saying the mailing date is key. And the date that decision was issued started the two-month period. This is an anomaly because we're dealing with electronic records that are much more available now in public than used to be. Now we have the transaction record that shows that something was done in May 30th, but the official record shows that nothing was done until June 2nd. Let's go on to the merits before we run out of time. Sure. On the merits, I'll be very quick here. There is no substantial evidence to support the board's findings that the Sasaki records dispose of the product that has a central cylindrical core that has ribs attached to it that are less… Does Sasaki have a core at all? Well, that's a very good question. It's a connective center. It's been a moving target, Your Honor. The claim is for the finished product. Correct. Not for the blank that's the beginning of the fabrication process. So figure 8 in the Sasaki reference is just a figure of the blank. Actually, I think figure 8 is a cross-section of the final product. I'm sorry. I've got the wrong number. Figure 6. Figure 6. But you're right. What is the cylindrical core has been a moving target. The board never identifies it. In the solicitor's brief, there are two different things discussed. One is allegedly the drawstring, and then there's an argument raising figure 7 for the very first time in this reexamination that suggested we should draw imaginary lines. Does Sasaki give us anything on compression? Actually, what it does give… The ribs have to be less than the core. Actually, what it does give is support to McNeil's position. There's very little text in Sasaki, but if you look at the claim language, the claim talks about compressed masses, and those are the appendages that the patent office says correlates to the ribs in McNeil's patent claims. The only time compressed is used is when you refer to these compressed masses. There's no reference to compression of a core. So it's a fair reading from that, but if there's anything that's more compressed than anything else in Sasaki… Let me read you something from the board decision on page 6. We find that Sasaki's figures 8 and 10 reasonably appear to depict the ribs of its tampons being compressed less at their distal ends than at their ends approximate to the drawstring at the center of the drawn fiber strip. So it looks to me like the finding of the board is captured in that one sentence, and they explicitly rely simply on two figures. So could I ask you to address what each of those two figures in your view does or does not show compared to what the board said it did depict? Certainly. And before I do that, I want to point out that this finding is really not even on point, because the claim doesn't require one end of the rib to be less compressed than the other end. The claim requires the rib to be less compressed than the core. That seems to me to be a bit unfair. I mean, I think that what they're saying is that the outer part is less compressed than the inner part, which is essentially finding that the core is more compressed. But the question is, what do these figures show about that? Or maybe the question is, back to what Judge Rader asked about, does Sasaki even have a core? That's right. And that obviously is a point… It certainly doesn't seem to have a core in the sense shown in your patent application figure 4. It shows a large portion of the center of the product is color-coded to be quite dense, and then all the ribs around that are color-coded to show much less density. Correct. It's very clear in the McNeil patent. So that suggests that in the McNeil patent, the core is not just the center of ribs. It's a separate piece with a different construction. Right. And that follows from the discussion in the McNeil patent about what the core does. It provides structural stability. The less dense ribs provide comfort and absorbability. So it makes sense that the compressed core doesn't have to have some structure around it, rather than just a line, a drawstring. And in answer to your question about figures 8 and 10, we don't believe that they can be fairly read to show anything about the relative compression of what you might deem to be a core. I mean, your figure at least uses light and dark shading, your figure 4, to show differences in compression rates. But in the Sasaki figures, there's no such shading used to depict relative differences in compression from one part of the product to another. That's exactly right. In other cases, we say... But somehow the board saw it there anyway. Did you get claim 5 for the apparatus for making this? I believe that has been allowed, yes. All right. Why don't you save the rest of your time for rebuttal, and we'll hear from the solicitor. Thank you. Receiver. Receiver, am I missing something? Is there something else that's being relied on for this relative compression limitation, other than, as they say at page 6 of their opinion, two figures, figures 8 and 10 from Sasaki? They are primarily relying on the figures. Primarily doesn't help me. What else, if anything else, do they explicitly rely on anywhere? They refer to the specification at page... About relative compressibility? No, they're asking about relative compression. No, not about relative compressibility. Okay, so we're down to two figures, then? Yes. Where in the two figures does it show anything about compression? I mean, it can't be so because the board said so. I mean, it's anticipation. It's anticipation. This is a claim limitation. So if it's not there, you don't have anticipation, and you've made a mistake. So show us compression, or the game's over. The specification does talk about compression. No, no, no. Figures 8 and 10 are what the board's relied on. Two figures. Where in either figure do we have any indication of relative degrees of compression? If you look at figure 8 and figure 10, they're effectively the same view. The center is much tighter. It's darker there, and the ribs that come out from it are wider at their distal ends, so they are less compressed at the ends than they are... How close to the center? How do we know? Just looking at the pictures. It's the nature of the fibers here. It's cotton. The rib spacing is important, too. The proximal end's got to be more separated than the distal end. Do we see that here? Yes. There is spacing. They're all touching. But there is separation as you get close to the center. You can see it... Where's the fiber core? It's at the center. But where's the core at all in Sasaki? You've got an active string attachment area, but I... The examiner explained in the final office action, the core is the center where the drawstring is sewn together with materials. It's bunched up there. If we talk about Figure 7 for a moment, that shows you the tampon blind inserted in the compressed mold there. That is a cross-section view where you can see that there is a center there, that is a core. But I'd like to back up for a minute before we even get to it. I would call the intersection of the ribs a core. If I may, before we even get to whether or not there was... I'm assuming your case is so weak that the real reason you brought this up is to talk about the dates. So, again, maybe you wouldn't have confessed error on this case if you didn't want to appeal the dates. So isn't the data decision really what this case is here for us? Yes. It's here about the data decision, but if I can just address... Let's look at that a second. The board only started writing a data decision on this a few years ago. Why isn't Helen correct here that the time-honored practice of the date that the PTO issues the thing is really the date of decision? That is the date of decision. It's not the date of decision. The statute speaks to date of decision. We are bound by the statute. But the only date we used to get was that single date of issuance. That was the date of decision. That's not correct. Did you issue some kind of regulation that changed that? No. There is no change from this long-standing practice. It's the same. In the paper days, you had a stamp that went on the decision. That was the date of the decision. There was one date. Who put the stamp on? I'm not sure who put the stamp on. When was it put on? It was put on coextensively probably when everything was written on the file. If you accept what their declaration says as being a practice... I think it was put on when they mailed it. That's why it was a stamp rather than typed in and then mailed. Wouldn't it be fair to say that the time-honored run from the time it's available? Otherwise, the patent office could have mail troubles and hold on to the decision for two weeks, a month, in a hypothetical, and you'd have no time to prepare your brief. Respectfully, it's not about fairness. There are regulations. The Director prescribed regulations for seeking an extension of time if your deadline has passed. The question is whether the deadline has passed or not. So to say that where your deadline has passed, there are some avenues of relief is irrelevant. That assumes that the deadline was passed. That's what's disputed here. There really is no dispute because they didn't have this action on the request language. Well, perhaps that was imprecise legislative regulation drafting, but it can only mean the date of the decision. We can't go beyond what Congress told us. We have to go beyond that. I imagine Ms. Elrican agrees on that too, but the dispute is over how to define what is the date of decision, not whether the language date of decision must be followed. It is the date on the face of the decision. It has always been that way. It's never been the date that it was entered on the file jacket. It's never been the date it was placed in the mail. It's never been the date that it gets posted on an electronic database. That would be effectively him to say that if this court issues an order on day one, but it doesn't go up the next day until days later, that the date of the order isn't the date of the order, and we don't have 30 days running from the date of the order. It doesn't make any sense that it would be the date that it is posted to an electronic database. In the Barb Asset case, we talked about the date of decision and sent it back down for allowing an extension. Is that an appropriate procedure in this case? That would be an appropriate procedure in this case. Would it be granted? That would really depend on what's in the request, but I can say that most of their arguments to this court speak more to the excusable neglect standard, which is the standard under which those are decided. It's very highly fact-driven, circumstance-driven inquiry, but we even offered this to McNeil way back in the day when this issue first came up, and they refused, and so here we are. They refused to what? To go that route. Is there a time limit in the excusable neglect law as to when you have to ask for the extension? Well, we apply the pioneer factors, and so there is a factor. What is the language of the rule? Did you quote the rule in your brief? The rule for seeking the extension, it just says if you're out of time, if it's more than 60 days, then it's decided under excusable neglect. So they could still apply for relief under that rule? Yes, yes, just as this court found in Barbason. That's the proper procedure. Once you pass the two months and the date in the case of the worst decision, that is the parade of horribles. That's the worst one that they came up with there, where the party never had any notice of the decision, and this court still found. It didn't have jurisdiction to hear the appeal. The board even tried to fix it there by issuing another order that said, no, your date of appeal runs from the date of this order, and the court said no, it doesn't. It runs from the date of the decision. Is it right that the electronic database is labeled official record? That's something I would like to correct. The image file wrapper and the rules that they quote about the electronic processing, it's the images that form the official file. It's not the date listing that's on the website. It is the images. It tells you you have to look to the document itself, and here we have the face of the document itself that says decided May 30th. And by the way, the mail cover sheet that accompanied this decision even says refer to the attached communication for any reply date. It doesn't report to be the date of the decision. It's not the date of the decision. The only thing that's the date of the decision is the date on the face of the decision. And we're not unsympathetic to practitioners who are typically dealing with prosecution before the office being used to a mail date. You know, we have had a petition under a request for extension, in fact, similar to this, where there was a discrepancy in the dates, and it was decided that it would be excusable in black standard, and we granted it. You know, I can't make an advisory comment as to what we would do here, but we're not unsympathetic to this. Of course, if we take that avenue and it goes back and you don't allow it, we'll probably have another appeal on the statutory construction. And if you do allow it and, again, reject the application, then we'll have another appeal on the merits. So it looks like it's going to come back here again if we remand, as opposed to the potential that we can decide everything in this case. That's true, but the court can't waive its jurisdiction, and that's what would have to happen. Could we ask the PTO at this point whether it would grant relief under the excusable in black standard? We would have to see the request, but they... No, no, if we said, please tell us whether you would grant relief here under the excusable in black standard, is that a question that we could ask you and you would answer? I think we would if they would like to potentially submit what they're requesting. No, no, no, if we ask you, not if they ask you, if we, Judge Dike, Judge Hayter, Judge Michaud, if we ask you to send us a letter, will you recede on this point yes or no? On the excusable in black standard? We can answer the letter. Based on what they have in their briefcase, we would answer the letter. We could answer the letter, yeah. Now, I would just for a moment like to go back to the merits because you were asking a bunch of questions about it before. McNeil waived that issue. It was never briefed to the board. They raised it for the first time in reconsideration. All that was before the board and what McNeil argued from day one was all about the ribs. But how can I decide anything about the compression rate of the core versus the compression rate of the ribs without having some idea what the core is? How do I know how to compare A and B without looking at B? They certainly raised the compression issue. They may have argued separately about the core, but I can't decide the compression issue without looking at the core. And the board found that there is a fiber core there. Yeah, it did, based on two figures. But I can't, for the life of me, see how they drew those conclusions from those two figures. It just looks like fiction to me. Well, the material is the same. And if you are, you know, putting something in a mold and compressing it, and it turns out like this, you have the ribs are at the far ends from the core are much less compressed than they are close to the core. You have to look at the relative distances and spacing, and the drawings clearly show that. So, it's the shape of each rib that you are saying proves that the compression nearer the center is greater than the compression out toward the periphery. Looking at this, given the starting point of figure 6 going to figure 8, I would assume that the compression was put on the outer ends, the distal ends of these phalanges coming out, which would suggest that maybe the distal ends are more compressed than the core. And it's silent. There's no way that you can tell one way or the other. Is it even enabling the Sasaki reference? Does it enable one to make or use something that even roughly approximates the claim of invention? The issue is whether these figures show to one of ordinary skill in the art what they reasonably could show. But they have to show that the ribs are less compressed than the core, that the ribs spacing, the proximal end has got to be more separated than the distal end. You've got to show a fiber core. Strike three. Pardon? That these figures show... How? How do they show any of the three things that you were just asking about? The specification talks about the cotton fiber, so we know it's made of cotton. It talks about the drawstring being sewn, so we know there's bunched up material there in the center. Yes, but there's also bunched up material in the periphery. And the question is, what's their relative compression? And I don't see that the figure tells us anything at all about that. Well, we disagree. And unless you find that the board was totally unreasonable, this is a substantial at least review. Was it reasonable for them to rely on figures? That's got to be anticipation. You've got to have it nailed. It's got to be identity. This isn't close. Is it on an identity standard? And it's factual, so... We believe it is, based on, if they looked at the specification, the description of the Sasaki drawings, and then these figures. And based on all of that, they found that Sasaki shows, teaches the relative rate of compression and the relative rate of spacing. How many understand these figures? There's figures six and seven, which is not quite correct. I'm having difficulty visualizing how that relates to figures eight and ten. Well, six and seven... It doesn't look like it. The figures don't look like the figures they found there. They don't, because eight and ten is after they've gone through the compression process. And so this compression mold here in seven gives you the cross-section that shows that there is, in fact, a generally solid core at the center. But it looks like the compression... It doesn't say, but it looks like the compression comes from the outside, right? It does appear that way. And that's what causes these phalanges to spread into the shape that they eventually get. Then why wouldn't the compression on the outside be more dense than on the inside? Because that's where the compression was actually put. I am not sure of the actual workings of the mold, but the drawing shows this is the end result. And we have to look at the drawings and the entire reference for what it reasonably teaches to one skilled in the art. And this reasonably teaches that you have relative compression of the distal end that's less than at the core, and relative spacing that's greater approximate to the core than at the distal end. If you have no further questions, let's take a listen. All right. Why didn't you just seek an extension? We didn't think that we had to. We thought that this was, that the field's understanding of the date of decision or the date of action was correct, and that we shouldn't have to go through that group. Well, I mean, that doesn't make any sense. I mean, are you trying to get us to rule on something that's not necessary for us to rule on by not seeking the extension? What's going on? Seeking the extension is not a big deal. Why didn't you? We didn't think it was necessary or the most expeditious way to proceed. Were you concerned  Well, certainly, given the course of the communications we've had with the faculty, we suspect that we needed it. The one point I want to make before sitting down is the caption on our decision doesn't say date of decision. It says decided. As we pointed out, there are opinions that are issued without any caption that says decided. So what's the date of decision for those? I guess for those, the solicitor would agree, well, we'd have to look at what it was going to do to the record. So just because in this fashion, the board has decided to put a decided caption on some decisions, now those appellants should be held to a different standard. It's, again, it's just unfair, it's inconsistent with long-standing practice because no public knows Is it fair to say you didn't even notice that date until after you missed the deadline? That's fair to say. So you've relied on the practice. Yes. All right. We thank both counsel. We'll take the appeal on your report. Thank you.